IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DAVID E. POUNDS,                          )
                                          )
        Plaintiff,                        )
                                          )
            vs.                           )    Civil Action No. 10-798
                                          )
MICHAEL J. ASTRUE,                        )
Commissioner of Social Security,          )
                                          )
        Defendant.                        )

**MEMORANDUM OPINION**

**I.   INTRODUCTION**

Pending before the Court are cross-motions for summary judgment filed by Plaintiff David E. Pounds, and Michael J. Astrue, Commissioner of Social Security.   Plaintiff seeks review of a final decision by the Commissioner denying claim for his supplemental security income benefits ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et seq.*   For the reasons discussed below, Plaintiff's motion is granted insofar as he seeks remand for further consideration by the Commissioner and Defendant's motion is denied.

**II.  BACKGROUND**

    A.   Factual Background

            David Eugene Pounds was born on February 7, 1983. (Certified Copy of Transcript of Proceedings before the Social Security Administration, Docket No. 6, "Tr.," at 93.)   After he was

identified as having a learning disability in first grade, Mr. Pounds attended special education classes until he dropped out of school at the beginning of his senior year. Although described as a polite, cooperative student under most circumstances, he demonstrated "extremely intense reactions to minor provocations and corrections from staff members." (Tr. 153.) In addition to the behavioral problems, Mr. Pounds also had learning difficulties as demonstrated by intelligence tests that revealed verbal reasoning and short term memory test scores at the bottom of the below average range and abstract visual reasoning and quantitative reasoning skills in the educable mentally retarded range. Overall, his composite score on the Stanford Binet Intelligence Scale (4th edition) administered when he was 17 years old was 74, which is within the educable mentally retarded range of functioning. (Tr. 154.) When given a series of tests when he was in eleventh grade (July 2000), his practical skills in reading, word identification, and spelling were at the first grade level, his listening comprehension skills were developed to a sixth or seventh grade level, and his math skills were at the fourth to fifth grade level. His ability to acquire and retain educational skills was considered "significantly below average." (Tr. 154-155.)

Psychological testing also administered in July 2000 revealed a "very limited awareness of his limitations," as reflected in the fact that he told the evaluation team that he planned to attend a

2

university or college such as Ohio State and work for a business. He believed he had the necessary skills and knowledge to handle everyday activities and although he acknowledged some difficulties with reading skills, he believed his other academic skills were well developed. The results of a functional behavior assessment test showed emotional, conduct, and anger control problems and an attention deficit index of 65, also indicative of problems. On the Reynolds Adolescence Depression scale, he scored "just below the cut-off for further evaluation for clinical depression." (Tr. 156.) His behavior had recently become "increasingly manipulative and dangerous," e.g., he had feigned a drug overdose and threatened to jump off a stairwell, resulting in a referral to mental health services. After he assaulted his high school principal, he was removed from the public high school and placed in an alternative education program. (Tr. 153.)

While he was in high school, Mr. Pounds participated in a job training program and worked part time as a maintenance person for a short period. He dropped out of school in 2003, then worked as bagger at a grocery store and as a dishwasher at two different restaurants. After leaving the last of these jobs, which he held for three days, he quit working entirely in October 2004. (Tr. 116.) At the time, Mr. Pounds was also affected by the death (possible suicide) of his older brother. (Tr. 170.)

3

By 2006, Mr. Pounds had been arrested and/or incarcerated multiple times for underage drinking, sexual assault on a minor, and probation violations. On June 4, 2006, he was admitted to the behavior services unit at Jameson Memorial Hospital in New Castle, Pennsylvania, after his mother became alarmed he might try to commit suicide when she discovered a notebook in which he had said goodbye to his acquaintances and described what he wanted for his coffin. His mother reported that after the death of Mr. Pounds' brother, Plaintiff had become increasingly depressed and suicidal. He was also using a number of street drugs and abusing prescription drugs and alcohol. (Tr. 170.) On his release from the hospital three days later, Plaintiff was diagnosed with major depression disorder, recurrent, severe[1] and a GAF score[2] of 45. Although he was supposed

---

[1] Major depressive disorder is a mental illness characterized by continual sad or anxious feelings; loss of interest or pleasure in former activities; changes in weight; insomnia or oversleeping; energy loss and fatigue; feelings of worthlessness, guilt, helplessness or hopelessness; irritability; difficulty concentrating, remembering details, or making decisions; thoughts of death or suicide; and/or ongoing physical problems such as pain, headaches, cramps or digestive problems. The most common treatments for depression are psychotherapy and medications which help balance chemicals in the brain. *See* the medical encyclopedia entry for "major depressive disorder" at the National Institute of Medicine's on-line website, Medline Plus, www.nlm.nih.gov/medlineplus (last visited January 27, 2011), "Medline Plus."

[2] The Global Assessment of Functioning or "GAF scale" assesses how well an individual can function according to psychological, social, and occupational parameters, with the lowest scores assigned to individuals who are unable care for themselves. Drejka v. Barnhart, CA No. 01-587, 2002 U.S. Dist. LEXIS 7802, *5, n2 (D. Del. Apr. 18, 2002). A GAF rating of 45 (i.e., in the range of 41 to 50) reflects "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR

4

to begin outpatient treatment at the Human Services Center in New Castle immediately after his release from the hospital, it appears Mr. Pounds was back in jail from June 2006 to December 18, 2006, due to a probation violation.

After returning for two appointments and beginning a course of psychotropic medications under the direction of Dr. Shoukry Matta at the Human Services Center in January 2007, Mr. Pounds sought treatment at Community Alternatives, Inc., also in New Castle, under the care of Dr. Ravindranath Kolli, a psychiatrist who initially diagnosed him with dysthymic disorder.[3]  (Tr. 311-312.)  Over the course of the next several months, Mr. Pounds' condition improved with medication and psychotherapy. However, sometime after October 24, 2007, he  again dropped out of the treatment program and stopped taking his medication.  He returned to Dr. Kolli in May 28, explaining that he felt he needed to be back on medication to help

---

any serious impairment in  social, occupational, or school functioning (e.g., no  friends, unable to keep a job)." *See* the on-line version of Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), Multiaxial Assessment, American Psychiatric Association (2002), at www.lexis.com., last visited January 28, 2011.

[3]  Dysthymia or dysthymic disorder is a type of chronic depression in which a person's moods are regularly low, but symptoms are not as severe as with major depression.  Although the exact cause is unknown, it is often accompanied by other long-term medical problems or mental health disorders such as anxiety, alcohol abuse or drug addiction.  Treatment consists of antidepressant drugs such as selective serotonin reuptake inhibitors, e.g., Prozac (fluoxetine), Zoloft (sertraline), Paxil (fluvoxamine) or Lexapro (escitalopram), along with some type of talk therapy.  Despite long-term treatment, many people continue to have some symptoms.  *See* the medical encyclopedia entry for "dysthymia" at Medline Plus.

with his concentration and mood stability. Dr. Kolli amended his diagnosis in July 2008 to include bipolar disorder[4] and personality disorder[5] as well as dysthymia.

As part of his probation conditions, Mr. Pounds was required to attend weekly individual psychological counseling sessions and participate in a program known as "Second Chance" which combined adult literacy courses and what Mr. Pounds referred to as treatment for "criminal thinking." (Tr. 27.)

B. Procedural Background

On February 9, 2007, Mr. Pounds protectively filed for supplemental security income benefits, claiming that he had been

---

[4] Bipolar disorder is a mental condition resulting from disturbances in the areas of the brain that regulate mood. It is characterized by periods of excitability (mania) alternating with periods of depression. During manic periods, a person with bipolar disorder may be overly impulsive and energetic, with an exaggerated sense of self. The depressed phase brings overwhelming feelings of anxiety, low self-worth, and suicidal thoughts. The mood swings between mania and depression can be very abrupt, or manic and depressive symptoms may occur simultaneously or in quick succession in what is called a mixed state. There is a high risk of suicide with bipolar disorder and it is often accompanied with alcohol or other substance abuse. The condition is treated with mood-stabilizing medications such as Depakote (valproic acid) or Lamictal (lamotrigine.) *See* the medical encyclopedia entry for "bipolar disorder" at Medline Plus.

[5] "Personality disorders are long-term patterns of thoughts and behaviors that cause serious problems with relationships and work. People with personality disorders have difficulty dealing with everyday stresses and problems. They often have stormy relationships with other people. The exact cause of personality disorders is unknown. . . . Symptoms vary widely depending on the specific type of personality disorder. Treatment usually includes talk therapy and sometimes medicine." *See* the medical encyclopedia entry for "personality disorder" at Medline Plus.

6

disabled from birth, that is, from February 7, 1983[6] (Tr. 93-99), and was unable to work due to learning disability, depression, and injuries to his back and neck. (Tr. 115.) His application was denied on April 24, 2007 (Tr. 71-75), after which Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ"") on June 20, 2007. (Tr. 76.)

On September 3, 2008, a hearing was held before the Honorable David G. Hatfield at which Plaintiff was represented by counsel. Judge Hatfield issued his decision on September 25, 2008, again denying benefits. (Tr. 58-70.) The Social Security Appeals Council advised Mr. Pounds on April 30, 2010, that it had chosen not to review the ALJ's decision, having found no reason under its rules to do so (Tr. 1-3); therefore, the September 25, 2008 opinion became the final decision of the Commissioner for purposes of review. 42 U.S.C. § 405(h); Rutherford v. Barnhart, 399 F.3d 546, 549-550 (3d Cir. 2005), *citing* Sims v. Apfel, 530 U.S. 103, 107 (2000). Plaintiff filed suit in this Court on June 11, 2010, seeking judicial review of the ALJ's decision.

C. Jurisdiction

This Court has jurisdiction by virtue of 42 U.S.C.

---

[6] At the hearing held on September 3, 2008, Plaintiff's counsel agreed to amend the disability onset date to February 9, 2007, the date on which he had protectively filed for SSI benefits. (Tr. 31.) When awarding supplemental security income benefits, the relevant period begins no earlier than the protective filing date. *See* 20 C.F.R. § 416.335.

§ 1383(c)(3) (incorporating 42 U.S.C. § 405(g)) which provides that an individual may obtain judicial review of any final decision of the Commissioner by bringing a civil action in the district court of the United States for the judicial district in which the plaintiff resides.

## III. **STANDARD OF REVIEW**

The scope of review by this Court is limited to determining whether the Commissioner applied the correct legal standards and whether the record, as a whole, contains substantial evidence to support the Commissioner's findings of fact. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389 (1971); Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999). Findings of fact by the Commissioner are considered conclusive if they are supported by "substantial evidence," a standard which has been described as requiring more than a "mere scintilla" of evidence, that is, equivalent to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, id. at 401. "A single piece of evidence will not satisfy the substantiality test if the [ALJ] ignores, or fails to resolve a conflict, created by countervailing evidence." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983).

This Court does not undertake *de novo* review of the decision and does not re-weigh the evidence presented to the Commissioner.

Schoengarth v. Barnhart, 416 F. Supp.2d 260, 265 (D. Del. 2006), *citing* Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986) (the substantial evidence standard is deferential, including deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence.) If the decision is supported by substantial evidence, the Court must affirm the decision, even if the record contains evidence which would support a contrary conclusion. Panetis v. Barnhart, No. 03-3416, 2004 U.S. App. LEXIS 8159, *3 (3d Cir. Apr. 26, 2004), *citing* Simmonds v. Heckler, 807 F.2d 54, 58 (3d Cir. 1986), and Sykes v. Apfel, 228 F.3d 259, 262 (3d Cir. 2000).

## IV. **LEGAL ANALYSIS**

### A. The ALJ's Determination

In determining whether a claimant is eligible for supplemental security income benefits, the burden is on the claimant to show that he has a medically determinable physical or mental impairment (or combination of such impairments) which is so severe he is unable to pursue substantial gainful employment[7] currently existing in the national economy. The impairment must be one which is expected to result in death or to have lasted or be expected to

---

[7] According to 20 C.F.R. § 416.792, substantial employment is defined as "work activity that involves doing significant physical or mental activities. . . . Work may be substantial even if it is done on a part-time basis." "Gainful work activity" is the kind of work activity usually done for pay or profit.

last not less than twelve months. 42 U.S.C. § 1382c(a)(3)(C)(i); Morales v. Apfel, 225 F.3d 310, 315-316 (3d Cir. 2000). A claimant seeking SSI benefits must also show that his income and financial resources are below a certain level. 42 U.S.C. § 1382(a).

To determine a claimant's rights to SSI,[8] the ALJ conducts a formal five-step evaluation:

(1) if the claimant is working or doing substantial gainful activity, he cannot be considered disabled;

(2) if the claimant does not suffer from a severe impairment or combination of impairments that significantly limits his ability to do basic work activity, he is not disabled;

(3) if the claimant does suffer from a severe impairment which meets or equals criteria for an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") and the condition has lasted or is expected to last continually for at least twelve months, the claimant is considered disabled;

(4) if the claimant retains sufficient residual functional capacity ("RFC")[9] to perform his past relevant work, he is not disabled; and

(5) if, taking into account his RFC, age, education, and past work experience, the claimant can perform other work that exists in the local, regional or national economy, he is not disabled.

---

[8] The same test is used to determine disability for purposes of receiving either SSI or disability insurance benefits. Burns v. Barnhart, 312 F.3d 113, 119, n.1 (3d Cir. 2002). Therefore, courts routinely consider case law developed under either program.

[9] Briefly stated, residual functional capacity is the most a claimant can do despite his recognized limitations. Social Security Ruling 96-9 defines RFC as "the individual's maximum remaining ability to perform work on a regular and continuing basis, i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule."

10

20 C.F.R. § 416.920(a)(4); *see also* Morales, 225 F.3d at 316.

In steps one, two, and four, the burden is on the claimant to present evidence to support his position that he is entitled to Social Security benefits, while in the fifth step the burden shifts to the Commissioner to show that the claimant is capable of performing work which is available in the national economy.[10] Sykes v. Apfel, 228 F.3d 259, 263 (3d Cir. 2000).

Following the prescribed analysis, Judge Hatfield first concluded that Mr. Pounds had not engaged in substantial gainful activity during the relevant period, that is, since the date of his protective filing, February 9, 2007, through the date of the ALJ's decision, September 25, 2008. (Tr. 63.) In resolving step two in Plaintiff's favor, the ALJ found that he suffered from a learning disorder, borderline intellectual functioning, and depression,[11] all of which were "severe impairments" as that term is defined by the

---

[10] Step three involves a conclusive presumption based on the listings, therefore, neither party bears the burden of proof at that stage. Sykes, 228 F.3d at 263, n.2, *citing* Bowen v. Yuckert, 482 U.S. 137, 146-147 n5 (1987).

[11] Although Plaintiff also alleged disability due to back and neck injuries, the ALJ did not make a finding as to the severity of these conditions. The medical record contains no more than passing references to such injuries which seem to have been incurred when Plaintiff was a child. (Tr. 294.) Plaintiff does not discuss this omission in the brief in support of his motion for summary judgment and we therefore conclude that any related argument has been waived.

Social Security Administration.[12]  (Id.)

At step three, the ALJ concluded that none of Plaintiff's impairments satisfied any of the criteria in the relevant Listings, i.e., Listing 12.05 (mental retardation) or 12.04 (affective disorders, including depression.)  (Tr. 17-18.)  At step four, the ALJ found that Mr. Pounds had

> the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: he is limited to simple tasks requiring little decision-making, which are goal-oriented, no production rate pace, which do not require reading, writing or math skills.

(Tr. 65.)

Relying on the testimony of the vocational expert ("VE") at the hearing, Frances N. Kinley, M.Ed., the ALJ concluded that a significant number of jobs existed in the national economy which Mr. Pounds could perform, e.g., laundry worker, laundry bagger, pressing machine operator, and mail clerk.  (Tr. 69.)  Therefore, based on Plaintiff's status as a younger individual[13] with an eleventh grade

---

[12]  *See* 20 C.F.R. § 416.921(a), stating that a physical impairment is severe only if it significantly limits the claimant's "ability to do basic work activities," i.e., "abilities and aptitudes necessary to do most jobs, including, for example, walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling," as compared to "a slight abnormality" which has such a minimal effect that it would not be expected to interfere with the claimant's ability to work, regardless of his age, education, or work experience.  Yuckert, 482 U.S. at 149-151.

[13]  Plaintiff was 22 years old at the time he applied for benefits, meaning he was considered a "younger individual" by the Social Security Administration, i.e., between the ages of 18 and 49.  20 C.F.R. §

education, the ability to communicate in English, no past relevant

work, his residual functional capacity, the medical evidence of

record, and the testimony of the VE, the ALJ determined at step five

that Mr. Pounds was not disabled and, consequently, not entitled to

benefits. (Tr. 70.)

B. Plaintiff's Arguments

Plaintiff argues Judge Hatfield erred as a matter of law

in denying his claim for benefits for four reasons:

1.  The ALJ failed to consider well-documented evidence
    of significant nonexertional limitations such as the
    inability    to    interact    appropriately    with
    supervisors, to maintain attention and concentration
    for extended periods of time, to complete a normal
    workday or workweek without interruptions from
    psychologically-based symptoms and to perform at a
    consistent pace without an unreasonable number of and
    length of rest periods.    (Plaintiff's Brief in
    Support of Motion for Summary Judgment, Docket No.
    9, "Plf.'s Brief," at 6-14.)

2.  The ALJ failed to appropriately consider Plaintiff's
    consistently low GAF scores.  (Id. at 15-19.)

3.  The ALJ failed to explain his credibility analysis
    and erred by relying upon bald misstatements and
    misrepresentations of the record.  (Id. at 20-23.)

4.  The ALJ's decision is not supported by substantial
    evidence because he relied upon an inaccurate and
    incomplete hypothetical question to deny benefits.
    (Id. at 24-25.)

We agree that the ALJ erred by omitting any substantive

416.963(c).

discussion of Plaintiff's consistently low GAF scores and by failing

to take into account Plaintiff's nonexertional limitations which in

turn caused the hypothetical questions posed by the ALJ to be

incomplete. We therefore will remand for further consideration.

C. Discussion

1. *The ALJ failed to consider Mr. Pounds' consistently*

*low GAF scores.* Plaintiff argues that at no point in his decision

did Judge Hatfield refer to his GAF scores between 30 and 50,

reflecting serious or very serious symptoms. Instead, the ALJ

mentioned only a single GAF score of 55, indicative of "no more than

moderate symptoms." [14]  Mr. Pounds argues that this single score

should be given relatively little weight because it was provided by

a consulting psychologist who met with him on only two occasions,

while his other scores of 30 to 50 were assigned by his treating

psychiatrist and staff at Jameson Hospital where he was admitted in

2006 for his severe depression and suicidal tendencies. He agrees

that low GAF scores, standing alone, are not sufficient to establish

disability, but contends they are relevant evidence an ALJ may not

properly overlook when discussing the mental health evidence.

Relying on numerous cases from this Circuit and others, Mr. Pounds

argues that the ALJ's failure to discuss the scores indicative of

---

[14]  Plaintiff argues that the ALJ erred in describing a GAF score of 55 as
indicating moderate symptoms because the "moderate symptoms" range begins
only with a score of 60. (Plf.'s Brief at 15.) Contrary to Plaintiff's
argument, the ALJ was correct in his description. *See* note 20 below.

14

serious psychological symptoms or problems in functioning is sufficient grounds for remand. (Plf.'s Brief at 15-19.)

In opposing this argument, Defendant contends that the omission of any discussion regarding Plaintiff's GAF scores in the 30 to 50 range is not fatal to the decision because it is well established that an ALJ is not required to refer to all the evidence presented, particularly evidence which is irrelevant to the case. (Defendant's Brief in Support of His Motion for Summary Judgment, Doc. No. 11, "Def.'s Brief," at 16, *citing* Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 204 (3d Cir. 2008).[15]) Moreover, although Dr. Kolli repeatedly noted that Plaintiff's mental condition was improving as he continued to take his prescribed medications, the doctor's GAF score remained unchanged over a period of several months. The ALJ was not required to consider such "fixed, repetitive" scores in light of the narrative portion of Dr. Kolli's reports which the ALJ did consider and explicitly addressed. (Def.'s Brief at 14-18.)

Taken chronologically, the first reports of Plaintiff's GAF ratings appear in the medical records compiled when he was hospitalized in June 2006 with severe depression and suicidal

---

[15] The evidence in Johnson which was considered irrelevant pertained to the claimant's medical condition two years *after* her date last insured in a case where the claimant was seeking disability insurance benefits; in addition, there was overwhelming evidence that discounted its probative value. Johnson, 529 F.3d at 204. Here, at least some of the GAF scores date from approximately a year or less before the date on which Mr. Pounds applied for SSI benefits. Thus, we find those scores to be highly relevant.

tendencies. (Tr. 163-250.) At the time of admission, his GAF was 30, indicative of very serious psychological symptoms or an almost complete inability to function in all social or occupational areas.[16] (Tr. 203, 204, 171.) On discharge, three days later, he was described as having no psychotic symptoms and his condition as much improved; his GAF was considered to be 45, still indicative of severe symptoms.[17] (Tr. 168-169.)

During treatment by Dr. Matta at the Human Services Center between June 9, 2006, and January 26, 2007 (Tr. 251-274), Mr. Pounds had both psychological counseling and medication checks. An intake form prepared on June 9, 2006, indicated that his GAF score was 38.[18] (Tr. 260.) Mr. Pounds was incarcerated as a result of probation violations from approximately mid-June until December 18, 2006 (Tr. 259), and there is no evidence that during that time he received any

---

[16] In the GAF range of 21 to 30, "Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)." DSM-IV.

[17] The DSM-IV describes the range of 41 to 50 as "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV.

[18] The GAF range of 31 to 40 reflects "Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." DSM-IV.

16

psychological counseling; he did receive medication in the form of Remeron.[19] (Tr. 253.) He returned to the Human Services Center on January 12, 2007, for outpatient treatment and medication, at which time his GAF was 48. (Tr. 254.) After approximately two weeks of treatment with Seroquel and Lexapro, in a follow up appointment Mr. Pounds told Dr. Matta he was "doing much better" and had experienced fewer racing thoughts at night, decreased mood swings, and fewer symptoms of depression. No GAF score was reported. (Tr. 252.)

In May 2007, Mr. Pounds began treatment with Dr. Kolli at Community Alternatives, Inc., in New Castle, Pennsylvania, explaining that "it was not working out" at the Human Services Center. (Tr. 310.) In the initial psychiatric evaluation prepared on May 23, 2007, Dr. Kolli noted a GAF of 50. (Tr. 312.) Between June and October 2007, Dr. Kolli conducted five medication checks and at each of those appointments, he indicated a GAF score of 50. After a hiatus of six months, during which time Mr. Pounds stopped taking his medication but apparently continued with his psychotherapy program, he consulted Dr. Kolli on May 28, 2008, at which time his GAF was again pegged at 50. (Tr. 304.) The same score was reported on July 9, 2008. (Tr. 305.)

Finally, on May 12 and 22, 2008, Dr. Suzanne Houk at Houk

---

[19] Remeron (mirtazapine) is used to treat depression. See drugs and supplements entry at Medline Plus.

Psychological Services conducted extensive psychological testing at the request of the Pennsylvania Office of Vocational Rehabilitation. In her summary report dated June 23, 2008, she indicated that Plaintiff's GAF was 55.[20] (Tr. 298.)

In his decision, the ALJ referred to the hospitalization records and those of Drs. Matta, Kolli and Houk. (Tr. 66-67.) Although he summarized the hospital records, particularly the fact that at the time he was admitted, Plaintiff had stopped taking his psychotropic medications[21] and was abusing prescription drugs and alcohol (Tr.

---

[20] The DSM describes a GAF in the 51 to 60 range as "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV.

[21] The ALJ alludes several times in his decision to the fact that Plaintiff had intermittently stopped taking his prescribed medications. See, e.g., Tr. 64, 65, 66, 67.. The Court agrees that symptoms which are reasonably controlled by medication are not disabling. See Dearth v. Barnhart, No. 01-3356, 2002 U.S. App. LEXIS 10162, *3 (3d Cir. 2002), citing Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling"); see also 20 C.F.R. § 416.930 ("In order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work.") However, it is clear from the medical literature available to the general public and has been recognized in legal opinions that non-compliance is a hallmark of bipolar disorder, particularly when the person is in the manic phase. See, for instance, Martinez v. Astrue, No. 10-1957 et al., 2011 U.S. App. LEXIS 960, *10 (7th Cir. Jan. 19, 2011), stating: "The administrative law judge found that Martinez's severe depression is well controlled by drugs—when she takes them—but ignored the fact that during manic spells Martinez had stopped taking her medications (a common consequence of mania). . . . [P]eople with serious psychiatric problems are often incapable of taking their prescribed medications consistently." See also Howard v. Astrue, CA 09-614, 2010 U.S. Dist. LEXIS 32623, *18-*19, n. 2 (W.D. Okla., Mar. 9, 2010) ("The National Institutes of Mental Health has stated "[n]oncompliance with medication is a very common feature among bipolar patients. Rates of poor compliance may reach 64% for bipolar disorders, and noncompliance is the most frequent cause

64-65), the ALJ failed to refer to Plaintiff's GAF scores in the 30 to 45 range. He acknowledged Dr. Matta's medical records, but did not refer to them in detail and did not note reports of GAF scores between 38 and 48. He commented extensively on Dr. Kolli's records (Tr. 66-67), but again, made no reference to the GAF scores of 50 for the entire period May 2007 through July 2008. Plaintiff is correct that the only specific reference to a GAF score was that made by Dr. Houk in her report of June 23, 2008, when she stated that his level of global functioning was moderately impaired, i.e., a GAF score of 55.

In the Third Circuit Court of Appeals' latest discussion of GAF scores and their role in the ALJ's analysis, the Court reiterated the Social Security Administration's position that "[a] GAF score does not have a direct correlation to the severity requirements of the. . .mental disorder listings." Gilroy v. Astrue, No. 08-4908, 2009 U.S. App. LEXIS 24515, *2 (3d Cir. Nov. 9, 2009). In that case,

---

of recurrence." (Internal citation omitted.)

If the ALJ concluded that Mr. Pounds' noncompliance with his psychotropic drug regimen was a contributing factor to his inability to work, this should have been directly addressed in his decision. See SSR 82-59, "Failure to Follow Prescribed Treatment," which directs that in such cases, "appropriate development must be made to resolve whether the claimant. . .is justifiably failing to undergo the treatment prescribed. . . . The claimant . . . should be given an opportunity to fully express the specific reason(s) for not following the prescribed treatment. The record must reflect as clearly and accurately as possible the claimant's . . .reason(s) for failing to follow the prescribed treatment." Although the ALJ questioned Mr. Pounds on this point at the hearing (Tr. 18-19), in his decision he did not discuss the reasons stated by Mr. Pounds for failing to take his medications as prescribed.

the physician who had assigned a GAF score of 45 to the plaintiff had not explained in his narrative why he believed Gilroy had a serious impairment in social or occupational functioning. Because the ALJ had repeatedly referred to the physician's notes in arriving at his conclusion that anxiety limited the claimant's ability to interact with supervisors, coworkers and the public, and because he had incorporated this limitation in his overall RFC determination, the Court of Appeals concluded that further comment on this one specific GAF rating was not required. Id. at *2-*4. The difference in this case is that Judge Hatfield not only neglected to discuss the GAF scores of 50 and below, he did not incorporate into his RFC limitations consist with such scores, e.g., "serious" impairments in social and occupational functioning.

In contrast to the decision in Gilroy, the Court of Appeals in another case found that the ALJ had, in fact, erred in failing to consider GAF scores offered by the plaintiff as evidence of severe mental problems. See Irizarry v. Barnhart, No. 06-2207, 2007 U.S. App. LEXIS 12159 (3d Cir. May 23, 2007). The plaintiff there had claimed disability due to anxiety and depression beginning in August 2002. The medical record from early 2002 included GAF scores of 30 to 37 when he sought treatment after he was released from prison; a score of 47 in February 2002; a score of 46 when he was hospitalized in April after threatening to commit suicide; and a score of 55 in

20

October when he underwent a one-time psychological evaluation at the request of the Pennsylvania Bureau of Disability Determinations. Id. at *3-*5. In his opinion, the ALJ noted the score of 55 but failed to discuss the scores between 30 and 47. The opinion also omitted any discussion of Irizarry's treatment during that period, which indicated to the Court of Appeals that the ALJ had failed to follow the mandate set out in Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981), that an ALJ must explain why he has rejected the medical opinions of a claimant's treating sources. Id. at *10.[22]

Although an ALJ may accept some parts of the medical evidence and reject others, he must consider all the evidence and give cogent reasons for discounting the evidence he rejects, particularly when he rejects evidence that suggests a contrary disposition. Adorno v. Shalala, 40 F.3d 43, 48 (3d Cir. 1994). "The failure to

---

[22] Irizarry is also relevant to another point. In that case, as herein, the defendant argued that most of the medical evidence related to the plaintiff's mental impairments predated the alleged onset of disability. (See Def.'s Brief at 12 and 14.) The Irizarry court noted that if this fact were relevant to the ALJ's rejection of the medical evidence, he should have stated so in his opinion in order to ensure meaningful judicial review. Furthermore, the facts indicated that the alleged onset date in that case was chosen because the plaintiff did not need disability benefits until he was terminated from his last job. Irizarry, 2007 U.S. App. LEXIS 12159, * 10, n.5. In this case, the ALJ clearly did not reject the medical evidence from before February 9, 2007, because he discussed Plaintiff's school records dating back to July 19, 2000, the medical records from his primary care physician dating from November 2003 through May 2006, the Jameson Hospital records from June 2006, and Dr. Matta's mental health treatment records from June 2006 to January 2007. Moreover, it is clear from the hearing transcript (Tr. 30-31) that February 9, 2007, was the date on which Plaintiff protectively filed for SSI benefits and thus that would be the earliest date on which such benefits could be awarded, even if he were found disabled as of an earlier date.

acknowledge a GAF score in and of itself can result in remand, in particular when the GAF score indicates serious symptoms or impairments in social or occupational functioning." Holmes v. Barnhart, CA No. 04-5765, 2007 U.S. Dist. LEXIS 21769, *31-*32 (E.D. Pa. Mar. 27, 2007). Here, the ALJ obviously considered Plaintiff's mental health treatment records from June 2006 through July 2008 in great detail and repeatedly referred to those portions of the records which suggest improvement, positive response to medication, "feeling better," and appropriate dress and demeanor. Yet he omits from his discussion such things as the fact that at the same time Plaintiff reported "doing much better," he was still having suicidal thoughts "approximately one or two times per week" (Tr. 252, January 26, 2007) or that although he was "cleanly groomed," "polite and cooperative," "smiled easily," and did not "show any evidence of depression" at another appointment, he simultaneously reported not sleeping well, "flipping out on people," and experiencing mood swings, irritability, and insomnia (Tr. 303, July 9, 2008.)

As for Defendant's contention that Dr. Kolli's repeated designation of Mr. Pounds' GAF rating as 50 should be given little or no weight because the narrative portions of his reports indicate steady improvement, we find this argument unavailing for at least two reasons. First, because the ALJ never mentioned Dr. Kolli's GAF scores, much less explained why he did not rely on them (see Tr.

66-67), this argument flies in the face of the Chenery doctrine which prohibits this Court from considering arguments which were not offered by the ALJ. *See* SEC v. Chenery Corp., 318 U.S. 80, 87, (1943) (it is a cardinal principle of administrative law that "the grounds upon which an administrative order must be judged are those upon which the record disclosed that its action was based"); *see also* Fargnoli v. Massanari, 247 F.3d 34, 43-44 and n.7 (3d Cir. 2001) (district court erred by offering its own independent analysis to rectify errors by the ALJ), and Cefalu v. Barnhart, 387 F. Supp.2d 486, 491 (W.D. Pa. 2005) ("the district court considers and reviews only those findings upon which the ALJ based the decision, and cannot rectify errors, omissions or gaps therein by supplying additional findings from its own independent analysis of portions of the record which were not mentioned or discussed by the ALJ.") Second, as noted in the DSM-IV, a GAF score actually reflects two factors: the severity of a patient's symptoms and his level of functioning. For example, a score of 50 reflects serious symptoms such as suicidal ideation, severe obsessional rituals or frequent shoplifting OR serious impairment in social, occupational or school functioning. Where the symptom severity and impairment severity are not at the same level, the clinician is directed to use the score which reflects the worse of the two. Thus, even if Mr. Pounds was showing less anxiety or depression when he was taking his medication over a period of several

months, Dr. Kolli may not have believed that his ability to function socially or occupationally had improved significantly or, alternatively, he may have considered that Mr. Pounds' continuing (albeit lessened) suicidal thoughts were still indicative of serious symptoms. Since he did not explain in his notes why he assigned this particular score, it must be taken at face value as the medical opinion of a treating physician. *See*, e.g., Gilroy, 2009 U.S. App. LEXIS 24515 at *2, stating that a physician's GAF score is "fairly understood to convey" his belief regarding a patient's level of impairment or ability to function.

Defendant also argues that the Court need not necessarily remand if the ALJ fails to mention every GAF score. (Def.'s Brief at 16-17.) While we agree that low GAF scores, standing alone, do not satisfy the claimant's burden to show he is disabled, "they are probative evidence that must be addressed by the ALJ." Bonani v. Astrue, CA No. 10-0329, 2010 U.S. Dist. LEXIS 137871, *20 (W.D. Pa. Oct. 15, 2010). We find no directive from the Third Circuit Court of Appeals that contradicts or overrules the holding of Colon v. Barnhart that the Social Security Administration's rules note that

> the GAF remains the scale used by mental health professionals "to assess current treatment needs and provide a prognosis." . . As such, it constitutes medical evidence accepted and relied upon by a medical source and must be addressed by an ALJ in making a determination regarding a claimant's disability.

24

Colon v. Barnhart, 424 F. Supp.2d 805, 812 (E.D. Pa. 2006).[23]

In Span v. Barnhart, CA No. 02-7399, 2004 U.S. Dist. LEXIS 12221 (E.D. Pa. May 21, 2004), the court ordered the case to be remanded because the ALJ had "glossed over" GAF scores which indicated that the plaintiff had serious mental impairments during the relevant time period. The court noted that although the ALJ did not completely ignore the GAF scores, he focused only on certain positive portions of the medical report and his "written opinion does not evidence that he seriously considered and weighed the importance of these scores. . . If the ALJ decides to give the GAF scores some weight, the ALJ must then consider whether the impairment is functionally equivalent to the listings." Id. at *23. We conclude the same omission occurred in this matter and will therefore remand in order for the ALJ to explain his consideration of Plaintiff's GAF scores in the range of 30 to 50 (particularly those assigned by his treating physicians Drs. Matta and Kolli) and whether they reflect impairments functionally equivalent to Listing 12.04.

2. *The ALJ's conclusions regarding nonexertional limitations:* Under Social Security regulations, a claimant's limitations may be described as exertional, nonexertional, or a combination of both. Exertional limitations are those which affect

---

[23] See also cases arriving at the same conclusion cited in Colon at 424 F. Supp.2d at 812-813, and in Bonani, 2010 U.S. Dist. LEXIS 13787 at *20-*21.

the person's ability to meet the strength demands of a job, e.g., sitting, standing, walking, lifting, carrying, pushing and pulling. 20 C.F.R. § 416.969a(b). The regulations identify exertional limitations as permitting the claimant to do work at the sedentary, light, medium, heavy and very heavy levels. 20 C.F.R. § 416.967. Here, Mr. Pounds does not dispute the ALJ's finding (Tr. 65) that he could perform a full range of work at all exertional levels.

Nonexertional limitations include other physical limitations such as the ability to see, hear, or work in environments that contain dust or fumes, and the ability to perform various manipulative or postural functions such as reaching, handling, stooping, climbing, crawling, or crouching. They also include mental limitations such as difficulty functioning because of nervousness, anxiety or depression, difficulty maintaining attention or concentration, and difficulty understanding or remembering detailed instructions. 20 C.F.R. § 416.969a(c).

Mr. Pounds argues that the ALJ erred by failing to include among his nonexertional limitations the inability to interact appropriately with supervisors, to maintain attention and concentration for extended periods of time, to complete a normal workday or workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number of and length of rest periods. Defendant

26

counters by pointing out that the concept of "simple tasks requiring little decision making" takes into account Mr. Pounds' borderline intellectual functioning, the restriction to tasks which are "goal-oriented" and do not require "production rate pace" recognizes that he has difficulty in maintaining concentration, persistence and pace, and that the elimination of jobs which require reading, writing and math skills takes into account his lack of academic performance above the primary school level. (Def.'s Brief at 12.)

Although the regulations themselves do not include as nonexertional limitations the inability to interact appropriately with supervisors or to complete a normal workday or workweek without interruptions for psychologically-based symptoms, Social Security Ruling[24] ("SSR") 85-15, "The Medical-Vocational Rules as a Framework for Evaluating Solely Nonexertional Impairments," recognizes that because mental illnesses are characterized by "maladaptive behavior," mentally impaired individuals frequently have difficulty accommodating to the demands and stresses of the working environment. When they are not working, they often adopt "a highly restricted

---

[24] "Social Security Rulings are agency rulings published 'under the authority of the Commissioner of Social Security' and 'are binding on all components of the Social Security Administration.'" Sykes, 228 F.3d at 271, citing 20 C.F.R. § 402.35(b)(1); Williams v. Barnhart, No. 05-5491, 2006 U.S. App. LEXIS 30785, * 8 (3d Cir. Dec. 13, 2006). "Rulings do not have the force and effect of the law or regulations but are to be relied upon as precedents in determining other cases where the facts are basically the same." Sykes, id., quoting Heckler v. Edwards, 465 U.S. 870, 873 n.3 (1984).

27

and/or inflexible lifestyle" and appear to function well. Mental health treatment, medication, and community support services may enable even chronically impaired individuals to function adequately while they are not working. However, the stresses of working on a day-in, day-out basis (e.g., getting to work, dealing with supervisors, remaining in the workplace for a full day), even though they may appear to be trivial to someone who is not mentally impaired, may result in such a person's inability to function effectively, even in so-called "low stress" jobs. "Because response to the demands of work is highly individualized, the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job. A claimant's [mental] condition may make performance of an unskilled job as difficult as an objectively more demanding job." SSR 85-15.

In describing Mr. Pounds' RFC, the ALJ limited him to "simple tasks requiring little decision-making, which are goal-oriented, no production rate pace, which do not require reading, writing or math skills." (Tr. 65.) In arriving at this description, the ALJ noted in particular Plaintiff's school records going back to July 2000 which established his learning disability and difficulties with all academic skills (reading, writing, and math) (Tr. 66); his hospitalization for depression in June 2006; (Tr. 66); the medical

28

records from Dr. Matta and Dr. Kolli (Tr. 66-67);[25] Dr. Houk's report

from June 2008 (Tr. 67); the lack of physical impairments reflected

in the records of Dr. Paul Sung (Tr. 67); and Mr. Pounds' own testimony

and reports of his activities of daily living.[26] (Tr. 68.)

The record contains substantial evidence of two factors which

the ALJ failed to include in his list of nonexertional limitations.

First, the record is replete with evidence that Mr. Pounds has

[25] Although we do not address the argument in detail in the body of this
opinion, we agree with Plaintiff that the ALJ sometimes failed to present
a balanced view of the record. For instance, when discussing the records
of Dr. Matta and Dr. Kolli at this point in his decision, he noted that
both referred to "missed appointments, 'no shows,' and the claimant's other
failures to comply with prescribed treatment." (Tr. 66.) We find one
reference in Dr. Matta's notes to a missed appointment which both he and
Mr. Pounds attributed to the fact that he had been taking Lexapro which
had previously caused the same side effect of forgetfulness. (Tr. 252.)
Dr. Matta noted that Plaintiff had been compliant with his medications.
There was also a reference to the fact that he had cancelled an appointment
on July 5, 2006, and did not reschedule (Tr. 262) and had failed to appear
for a psychological exam on June 28, 2006 (Tr. 264.) Although not
precisely stated in the record, it may be that these appointments were
missed because Plaintiff was incarcerated for probation violations at the
time. See Tr. 259 stating that he had just been released on December 18,
2006, after 6 months' incarceration. Dr. Kolli's notes do refer to the
fact that Mr. Pounds had stopped taking his medications sometime after
October 2007 (Tr. 304), but, as discussed in note 21 above, this behavior
is common in persons diagnosed with bipolar disorder. We find no other
references to missed appointments, no shows, or failure to comply with
prescribed treatment, although on one occasion, he appeared at Dr. Kolli's
office at the wrong time. (Tr. 307.)

[26] This is another area where the ALJ mis-interpreted or mis-reported the
record. For instance, he noted that Mr. Pounds testified that he cared
"for 17 animals, including dogs and fish." (Tr. 68.) Mr. Pounds testified
that 15 of those 17 animals were fish. (Tr. 27.) He stated that Mr. Pounds
could write and could "read well enough to generally understand a
newspaper." Mr. Pounds testified that he could write a note to his mother,
despite his "real bad" spelling because she had been "around me for years."
(Tr. 12-13.) He could read "some" of the newspaper, "if I understood it.
Sometimes I don't." (Tr. 12.)

29

difficulty in social functioning far beyond that reported by the ALJ in his decision, that is, what he characterized as "mild difficulties."

"Social functioning" refers to a claimant's

capacity to **interact independently, appropriately, effectively, and on a sustained basis with other individuals.** Social functioning includes the **ability to get along with others, such as family members**, friends, neighbors, grocery clerks, landlords, or bus drivers. You [i.e., a claimant] may demonstrate **impaired social functioning** by, for example, **a history of altercations,** evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation. You may exhibit strength in social functioning by such things as your ability to initiate social contacts with others, communicate clearly with others, or interact and actively participate in group activities. We [i.e., the Social Security Administration] also need to consider cooperative behaviors, **consideration for others, awareness of others' feelings, and social maturity.** Social functioning in work situations may involve interactions with the public, responding appropriately to persons in authority (e.g., supervisors), or cooperative behaviors involving coworkers.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00 (emphasis added.)

Judge Hatfield noted Mr. Pounds' inability to trust many people, his conviction and incarceration for aggravated assault, and an attack on his father with a baseball bat. These were offset by Mr. Pounds' ability to get along with his mother, his social interactions, e.g., going to movies or "hanging out" three times a week with his friends, and his ability to communicate well both with his treating physicians and at the hearing. (Tr. 64.) However, we

agree with Plaintiff that the record shows far more serious

limitations in social functioning than the ALJ acknowledged, e.g.:

- He assaulted one primary and two high school teachers. (Tr. 292.)

- He was first charged with underage drinking at age 16 or 17. (Id.)

- At age 18, he was charged with verbally harassing a girlfriend's mother, resulting in the entry of a protection from abuse order and three months' probation. (Id.)

- Also at age 18 he was charged with aggravated indecent assault on a 12-year old, resulting in 24 months' jail time, three years' probation and court-ordered psychological counseling. (Id.)

- After his release, he violated probation and served an additional six months in jail. (Id.)

- In February 2008, when he attacked his father with a baseball bat, he avoided further legal problems only by agreeing to observe a protection from abuse order. (Tr. 25.)

- A few weeks before the hearing, he "flipped out" when a "drug dealer" at the Second Chance program "pulled out drugs." (Tr. 33.)

While the ALJ did, as Defendant argues, account for some

non-exertional limitations – borderline intellectual functioning,

and lack of academic skills – there appears to be no recognition of

Mr. Pounds' inability to deal with authority figures (e.g., school

teachers and his father) or to react appropriately in his

interactions with others in society (e.g., his numerous legal

problems.) There is no evidence that the Court can identify in the

31

record which would cast doubt on the veracity of these reports and there is nothing in the ALJ's decision which would explain why he evidently believed that these limitations would not have a negative effect on Mr. Pounds' ability to perform work on a regular basis.

Similarly, the ALJ failed to consider sufficiently Plaintiff's documented inability to maintain concentration and pace. According to Social Security regulations,

> [c]oncentration, persistence, or pace refers to the **ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings.** Limitations in concentration, persistence, or pace are best observed in work settings, but may also be reflected by limitations in other settings. In addition, major limitations in this area can often be assessed through clinical examination or psychological testing. Wherever possible, however, a mental status examination or psychological test data should be supplemented by other available evidence. . . .

> We must assess your ability to complete tasks by **evaluating all the evidence, with an emphasis on how independently, appropriately, and effectively you are able to complete tasks on a sustained basis.** . . .You may be able to sustain attention and persist at simple tasks but may still have difficulty with complicated tasks. . . .However, if you can complete many simple tasks, we may nevertheless find that you have a marked limitation in concentration, persistence, or pace **if you cannot complete these tasks without extra supervision or assistance,** or in accordance with quality and accuracy standards, or at a consistent pace without an unreasonable number and length of rest periods, or without undue interruptions or distractions.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00 (emphasis added.)

In his decision, the ALJ found that Plaintiff had "moderate

32

difficulties" in maintaining concentration, persistence or pace. (Tr. 64.) He refers to several factors which he took into consideration in arriving at this conclusion: Mr. Pounds' testimony that he cannot "focus" very long; the results of Dr. Houk's intelligence and other tests which indicate Plaintiff had "relative strengths" in perceptual reasoning and social judgment,[27] that he would benefit from vocational training, and would do best in occupations that did not have a strong academic component; and Mr. Pounds' demeanor at the hearing which showed him to be alert, to adequately remember events, dates and names, and to be able to respond to questions "appropriately and with reasonable intelligence." (Tr. 64.) The problem with this list of factors is that they do not, with one exception (Mr. Pounds' reported inability to "focus" very long), relate to one's concentration, persistence or pace, but rather to his general intelligence, education and memory.

The most objective evidence of Mr. Pounds' inability to concentrate comes from Dr. Houk's evaluation of June 2008. The ALJ failed to note that when summarizing the test results, Dr. Houk concluded the tests designed to evaluate that ability reflected "difficulties in attention and sustained concentration." (Tr.

---

[27] Again, the ALJ points to Plaintiff's strength in perceptual reasoning and social judgment without taking into account that "relative" in this context meant that Plaintiff's scores on these portions of the intelligence tests were scored as "average," as compared to other portions of the tests reflecting below average, borderline and very low abilities. (Tr. 295.)

298.)  He also had a low score in working memory which Dr. Houk found "indicative of concerns with attention." (Id.)  Moreover, other evidence refers to Plaintiff's inability to concentrate.  For instance:

- Plaintiff was diagnosed with attention deficit hyperactivity disorder at age 9. (Tr. 291.)

- He told Dr. Houk that he "has difficulty concentrating, is easily distracted at times," and thought that at his next medication checkup, he might be prescribed medication "for focus." (Tr. 293.)

- Dr. Houk noted, "He finds it hard to understand why he is able to remain focused on suicide and death, yet unable to remain focused on 'other things like homework.'" (Tr. 293.)

- During the testing phase of the evaluation, Dr. Houk observed that Plaintiff "appeared adequately motivated and attentive to tasks presented, however gave up easily on various tasks, particularly those where performance is related to academic skills." (Tr. 294.)

- On the Luria-Nebraska Neuropsychological Battery of tests, Plaintiff performed "lower on items that were more demanding with regard to sustained concentration" and he "performed below expectation in items that are particularly susceptible to attentional difficulties or emotional disturbances." (Tr. 295-296.)

- Mr. Pounds reported to Dr. Kolli during his initial psychiatric evaluation in May 2007 that he had "difficulty staying focused on his activities [and] his mind wanders." (Tr. 310.)

- In the mental status examination of May 2007, Dr. Kolli noted that Mr. Pounds "seems to be distracted easily." (Tr. 311.)

- Dr. Kolli noted on May 28, 2008, that Plaintiff had returned after six months of not taking medication and had

34

returned in part because he "now feels that he needs to be back on medication to help with his concentration and mood stability." (Tr. 304.)

- During the hearing, when asked what it was that prevented him from working, Mr. Pounds replied, "Like I can't focus long. . .and that's what hurting me mainly." (Tr. 17.)

- When asked to give an example of not being able to focus long, he replied, "Like - like doing something, like - if you like - somebody would have to tell me how to do it. I can't like do something. I can't read right. That's real hard on me, and then the focusing is like I'll get into it and then I'll stop and then I'll forget what I just did. . . . so I've been like trying to work around the house but then I mess it up because I forget where I ended." (Tr. 18.)

- He also testified that when he plays video games, he normally stopped because "after a while it gets boring and then I can't focus so I just stop or it makes me mad." (Tr. 36.)

The only evidence to support the conclusion that Plaintiff would have no difficulty maintaining attention, concentration and pace while on the job is the report of the state agency examiner, Roger Glover, Ph.D., who reviewed Plaintiff's file on April 24, 2007. (Tr. 275-277.) In the section of his report addressing those factors, Dr. Glover concluded Plaintiff was not significantly limited in his ability to carry out very short and simple instructions, perform activities within a schedule, maintain regular attendance, and be punctual, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being distracted, and make simple work related decisions. He was

moderately limited in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, and complete a normal workday and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 275-276.)[28]

The only medical evidence Dr. Glover referred to in his report

---

[28] The Court has significant problems with Dr. Glover's report. First, it was either based solely on the records of the Human Services Center from June 2006 through January 2007 - the only records referred to by name in Dr. Glover's report - or else he completely ignored the fact that Mr. Pounds was hospitalized for severe depression and suicidal ideation in June 2006. Second, the only evidence explicitly cited by Dr. Glover is from Dr. Matta's reports of January 12 and January 26, 2007. Dr. Glover summarizes the first report as follows: "[A]lert, oriented x3. Mild distress. Thought content and process is mostly appropriate and goal directed. No homicidal ideation. Pleasant and cooperative. Insight and judgment are fair. IQ appears low normal. [diagnosis of major depressive disorder.]" Dr. Glover continued, noting that the checkup on January 26, 2007, "reveals that the claimant is in a better mood and he has less racing thoughts." (Tr. 290.)

Dr. Glover fails to indicate that in those same reports, Dr. Matta commented on January 12 that Mr. Pounds experienced racing thoughts about his brother's death and the possibility of returning to jail; had thoughts of suicide "approximately three to four times per week;" complained of mood swings, irritability and depression; was sleeping only three hours to four per night; and his GAF was 48, indicative of serious symptoms. (Tr. 253-254.) At the checkup two weeks later, Mr. Pounds was still having suicidal thoughts "approximately one or two times per week;" was still fatigued despite having increased his sleep to about 5.5 hours per night even with medication; and was experiencing forgetfulness which Dr. Matta concluded was a side effect of Lexapro. (Tr. 252.)

Since Dr. Glover's report was apparently based on a review of an incomplete file, prepared before Dr. Kolli's notes were compiled in May 2007 through July 2008 or Dr. Houk performed her psychological evaluation in June 2008, and is a biased and incomplete summation of the notes from Dr. Matta which he did review, his conclusions must be viewed skeptically. However, we note that the ALJ carefully did not state that he relied on Dr. Glover's report but only that his own assessment was "consistent" with it. (Tr. 65.)

36

was the medical records from Human Services Center and, although those records covered more than eight months, he cited evidence from only two appointments in January 2007. (Tr. 290.) Nothing in those reports even vaguely alludes to Plaintiff's ability to perform work-related activities such as carrying out instructions, performing on schedule, working with others, and making work-related decisions. We are forced to conclude first that Dr. Glover either did not have in the file other evidence such as medical notes from Plaintiff's hospitalization in June 2006, his self-reported activities of daily living, and the comprehensive evaluation report from Mr. Pounds' school system or he ignored all of that evidence. In either case, his file review was incomplete, even without taking into consideration the later reports of Drs. Kolli and Houk. Second, since there was nothing in Dr. Matta's notes to support his conclusions that Plaintiff was no more than mildly or moderately limited in his ability to maintain concentration, persistence and pace, Dr. Glover's findings must be viewed as entirely hypothetical.

Dr. Houk's objective psychological tests, not only Plaintiff's own reports, support his claims that he has difficulty focusing and maintaining attention even when the task at hand is not complicated and does not require academic training or intelligence levels he does not possess. The ALJ evidently either did not consider or rejected Dr. Houk's findings which indicated Mr. Pounds would have

considerable difficulty in sustaining concentration over any significant period of time. Remand is therefore necessary for clarification of whether he took into account Dr. Houk's findings on this issue.

3. *The ALJ's hypothetical questions*: We also conclude that the hypothetical question posed by the ALJ to the Vocational Expert was incomplete because it failed to include Plaintiff's nonexertional limitations, particularly those regarding concentration and pace. At the hearing the ALJ posed two relevant questions:[29]

> Let's assume we have a person who has no past relevant work, the age and education as he testified, and assume this hypothetical person would not be limited exertionally but they would be limited to simple tasks, so the task would not be detailed or complex, it would be simple tasks. The tasks would be goal oriented as opposed to production rate pays. [pace??] There would be little decision making required on the job, and the job would not involve reading, writing or math skills. There may be a little bit of, you know, reading a sign or something, but the skills of reading, writing or math would not be required. Based on that hypothetical could such a person do any occupations, and if so could you give me some examples?

(Tr. 37-38.)

In response to this question, Ms. Kinley, the Vocational Expert, identified several occupations which could be performed by a person sharing those characteristics, i.e., laundry worker, laundry bagger,

---

[29] The ALJ actually posed a third question referring to how much supervision the jobs identified by the VE would entail once the work-related tasks were learned. (Tr. 39-40.)

pressing machine operator, and mail clerk.[30]  (Tr. 38-39.)   The ALJ

then continued,

> Now if I added to that hypothetical the person would need
> to be redirected to tasks, even tasks in the jobs you just
> cited, they have to be redirected about every hour, so
> they're on task and then they stray from task unless the
> supervisor redirects them, would that change your
> response?

(Tr. 39.)

The Vocational Expert responded, "Yes.  If that was the case,

then that's not compatible with competitive work, being able to do

competitive work."  (Tr. 39.)

> In his decision, the ALJ indicated in a footnote that

> although additional hypothetical questions were posed to
> the vocational expert by me and/or the claimant's
> representative which contained further limitations on the
> claimant's capacity for work, I ultimately concluded that
> these limitations were not consistent with the evidence
> of record, and did not accurately reflect the claimant's
> residual functional capacity.

(Tr. 69, n.4.)  The logical conclusion inferred from this note must

be that the ALJ found evidence in the record that Plaintiff did not

need to be redirected to tasks on a regular basis, i.e., that he had

the ability to concentrate for an hour at a time - at least when the

work required no more than simple, goal-oriented tasks and did not

involve reading, writing or math.   The problem with this conclusion

---

[30]   In response to a follow up question from the ALJ, the Vocational Expert
clarified that the "mail clerk" job was not one which involved sorting mail
which may have required reading skills above those possessed by Mr. Pounds;
the work would involve "envelope stuffing jobs and putting envelopes
through machinery for postage."  (Tr. 38-39.)

is, as discussed above, that there is objective evidence Mr. Pounds does lack the capacity to concentrate for extended periods of time and almost no evidence (i.e., only Dr. Glover's report) which would support the opposite conclusion.

As Plaintiff points out, "great specificity" is required when composing a hypothetical question, particularly one which requires incorporation of mental limitations.    (Plf.'s Reply Brief at 3, Doc. No. 12, *quoting* Burns, 312 F.3d at 122.)    This means that where the record includes "medically undisputed evidence" of specific impairments which the ALJ fails to include in a hypothetical question to a vocational expert, the expert's response cannot be considered "substantial evidence."    Podedworney v. Harris, 745 F.2d 210, 218 (3d Cir. 1984).    Thus, courts have rejected the idea that reference to "simple one to two step tasks" adequately conveys the limitations of a claimant with established deficiencies in concentration, persistence, or pace.    *See* Ramirez v. Barnhart, 372 F.3d 546, 555 (3d Cir. 2004).    Another district court in this Circuit has concluded that where the ALJ had found that the claimant had a moderate degree of limitation in concentration, persistence and pace, a hypothetical question which limited him to "simple repetitive tasks" and "only occasional contact with the public and co-workers" did not sufficiently convey those nonexertional limitations.    Steininger v. Barnhart, CA No. 04-5383, 2005 U.S. Dist. LEXIS 18290, at *3-4 (E.D.

Pa. Apr. 24, 2005). And, in case with facts highly similar to those here, where the ALJ had included in his hypothetical question the claimant's minimal abilities to read and write, his borderline intelligence, limited education, and the inability to perform anything more than simple jobs, but had omitted any restrictions due to his deficiencies in concentration, persistence and pace, the court rejected the Commissioner's argument that the limitation to simple jobs was sufficient to account for those deficiencies. Moreover, in another parallel to this case, when the vocational expert was asked about the effect the inability to maintain concentration and pace would have on the claimant's ability to work, she indicated this would cause problems on an ongoing daily basis, because such abilities related to basic work habits needed to maintain employment. Newton v. Chater, 92 F.3d 688, 695 (8th Cir. 1996).

We conclude that the ALJ failed to incorporate well-supported nonexertional limitations in concentration, persistence and pace as well as in social functioning in the first hypothetical question posed to the Vocational Expert at the hearing. Therefore, the VE's answer indicating that jobs existed in the economy which could be performed by someone with Mr. Pounds' characteristics cannot be considered substantial evidence on which the ALJ justifiably relied in step five of his analysis. Thus, this case must be remanded for further consideration.

## V. FURTHER PROCEEDINGS

"A district court, after reviewing the decision of the Commissioner, may under 42 U.S.C. § 405(g) affirm, modify, or reverse the Commissioner's decision with or without a remand to the Commissioner for a rehearing." Newell v. Comm'r of Soc. Sec., 347 F.3d 541, 549 (3d Cir. 2003). However, the reviewing court may award benefits "only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the plaintiff is disabled and entitled to benefits." Krizon v. Barnhart, 197 F. Supp.2d 279, 291 (W.D. Pa. 2002), quoting Podedworney, 745 F.2d at 222.

Based on the evidence, we are not convinced that Mr. Pounds is disabled and entitled to benefits, primarily because we are unable to discern how the ALJ considered and weighed much of the evidence regarding Plaintiff's nonexertional limitations which in turn affected the adequacy of his hypothetical questions to the Vocational Expert. Rather than award benefits outright, we remand to the Commissioner for clarification of the ALJ's reasoning and further consideration.

February ___17___, 2011

William J. Standish
William L. Standish
United States District Judge

42